**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
**ARACELI KING,**

                              **Plaintiff,**


              **-against-**                              **14 Civ. 2018  (AKH)**


**TIME WARNER CABLE, INC.,**

                              **Defendant.**
------------------------------------------------------------X

### MEMORANDUM OF LAW OF TIME WARNER CABLE INC. IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO SUMMARY-JUDGMENT MOTION OF PLAINTIFF

The court should enter summary judgment in Time Warner Cable's favor because the plaintiff has suffered no injury, which is a Constitutional-standing requirement.  Alternatively, the court should enter summary judgment in Time Warner Cable's favor because the plaintiff is a Time Warner Cable customer, she voluntarily provided her phone number to Time Warner Cable, and she gave consent for Time Warner Cable to call her number using any method for any purpose.

Alternatively, King's motion for summary judgment should be denied relating to calls in which messages were not left because Time Warner Cable's IVR is not an automated dialer as defined by the statute.  Alternatively,

King's motion for summary judgment should be denied because there is a genuine dispute as to how many calls were made and how many messages were left. And, finally, King's motion for summary judgment should be denied relating to enhanced damages because Time Warner Cable never intentionally called King while attempting to reach another customer.

## BACKGROUND

- *The nature of the action.*

King sues under the Telephone Consumer Protection Act to recover statutory damages because—she says—Time Warner Cable without her consent either used an automatic telephone dialing system to call her cell phone or left a prerecorded message on her cell phone. Time Warner Cable denies that it used an automatic dialing system, which is defined in the Act, but agrees that it placed some calls intended for another customer to King's cell phone. But those calls (some of which were answered, some of which involved leaving a prerecorded message, and some that were neither answered not involved a prerecorded message) were made with King's consent both when she voluntarily gave her cell number to Time Warner Cable and when she agreed to Time Warner Cable's residential services subscriber agreement, which allows Time Warner Cable to call its customers on the numbers that they provide.

- *Time Warner Cable's IVR system.*

Time Warner Cable has designed and built its own interactive voice response system, which is known by the initials IVR. Deposition of David W. Zitko at 18, 37 (**Exhibit 7**). Time Warner Cable's customers have the option of associating a telephone number with their accounts by voluntarily giving their telephone numbers to Time Warner Cable. Deposition of David W. Zitko at 22–23 (**Exhibit** 7). King associated her telephone number with her Time Warner Cable account when she "provided [her] cellular telephone number to TWC in connection with [her] TWC account." Declaration of Araceli King ¶ 3.

Time Warner Cable designed its IVR system both to receive calls from customers and to make calls to customers. For example, Time Warner Cable can call its customers and remind them when their accounts are past due. To do this, it runs a query on Time Warner Cable's accounts each morning and compiles from that query a list of customers with accounts that are overdue. Deposition of David W. Zitko at 43–44, 93–94 (**Exhibit** 7). Typically, a payment must be more than 30 days past due for the system to select the account. Deposition of David W. Zitko at 35 (**Exhibit** 7).

The IVR system then takes from the account records discrete information, such as the customer's name, her account number, and the

telephone number that she has given to Time Warner Cable.   Deposition of David W. Zitko at 35, 44, 94–95 (**Exhibit** 7).   It stores that information but only for a single day.   Deposition of David W. Zitko at 95 (**Exhibit 7**).   For the IVR to place calls to the same account on a different day, the account must meet the criteria for a call, and the system must again obtain the account information, including the telephone number, from the account records.   Deposition of David W. Zitko at 44–45, 93–94 (**Exhibit 7**).

- *How customers are selected for calls.*

       Time Warner Cable's IVR system is designed with the hope of making contact with Time Warner Cable's customers to alert them to their failure to pay so that customers can cure the default prior to a service interruption.   If the customer answers the initial call, no additional calls are made that day.   If the customer makes payment arrangements, no additional calls are made until the next default, if any.   If the customer does not answer the call, Time Warner Cable will wait several hours and may try to make contact up to two additional times that day.   Deposition of David W. Zitko at 36, 55, 72 (**Exhibit 7**).[1]

-------

[1] The calling times used by Time Warner Cable's IVR system are shorter than that permitted under the Federal Debt Collection Practices Act.   *See* Federal Debt Collection Practices Act § 805(a)(1), 15 U.S.C. § 1692c(a)(1).   The FDCPA permits calls between 8 o'clock in the morning and 9 o'clock at night "local time at the customer's location."   FDCPA § 805(a)(1), 15 U.S.C. §

But before the IVR system calls a customer, it first checks to make sure that the customer's account is past due.

> Q.  Any other reasons?
>
> A.  Before any outbound phone call is placed, there is a check of the billing system that is done to see if a customer has made a promise to pay or a payment, and if they have, we do not make a phone call.

Deposition of David W. Zitko at 72 (**Exhibit 7**).  Because the IVR system is set up to check if the customer has made a payment or a promise to pay and then not to call the customer if her account is up to date, calls are not made sequentially from the list of accounts stored that morning by the IVR.  Instead, much like hand-dialed calls in which the caller first checks the account status, calls are placed only after making sure that the account is past due.

> Q.  Okay.
>
> A.  Or I should say early in the morning when they are actually pulled from the billing system to get the most accurate information, but then *we still—this is where we still do the check for promised to pay, payments made, before each call is made*.

Deposition of David W. Zitko at 95 (emphasis added) (**Exhibit 7**).

---

1692c(a)(1).   Time Warner Cable, by contrast, does not make calls before 9 o'clock in the morning or after 8:45 o'clock at night on weekdays, uses a shorter calling period on Saturdays, and makes no calls on Sundays.  *See* Deposition of David W. Zitko at 55 (**Exhibit 7**).

- *How customers are contacted.*

If the call is answered, a recorded message plays that asks the person answering the call to confirm that she is the intended recipient and then provides options, including talking with a representative.  Deposition of David E. Zitko at 42 (**Exhibit 7**).  The Time Warner Cable IVR system is set up to leave no more than one message on an answering machine in any one day.   Declaration of David W. Zitko ¶ 9.

The IVR system is set up to distinguish between a customer's voice and the customer's answering machine.  Deposition of David W. Zitko at 53 (**Exhibit 7**).  If the IVR system reaches an answering machine, it will leave a message for the customer but only on the first answering-machine contact of the day.  The IVR system terminates any subsequent calls that reach an answering machine.  Deposition of David W. Zitko at 53 (**Exhibit 7**).  Thus, no more than one message is played on any day that calls are made.

- *How many calls were there?*

King does not provide much in the way of help on how many calls she received.  That's because some of the material she produces, such as King's account record, is not presented in a form that would be admissible in evidence. Other material, such as the Sprint telephone log, shows calls but not the type of

call (i.e., whether a message was left).  Moreover, King appears to count as calls all calls that she received from Time Warner Cable, even though that number is meaningless because only some calls (those in which a prerecorded voice is used) have the potential to violate the TCPA's prohibitions.

The easiest way to see those calls is to use the Excel spreadsheet (**Exhibit B**) that contains a record of calls to 915-861-0528 and look at the CCM_Outbound tab, which shows calls beginning on July 3, 2013.  The last entry in column I, which is labeled ATTEMPT_STATUS, notates what the IVR heard and if the call was completed or not.  Only two types of calls use a prerecorded voice: calls that are answered by the customer and calls in which a message is left on the customer's answering machine.  Declaration of David W. Zitko ¶ 8.

The calls answered by the customer are indicated in column I by LIVE_VOICE.  Declaration of David W. Zitko ¶ 9.  The calls in which a message was left on the customer's answering machine are the first call each day that show ANSWERING_MACHINE in column I.  Declaration of David W. Zitko ¶ 9.

The calls to 915-861-0528 that reached the customer (LIVE_VOICE) are shown on lines 18, 19, 21, 22, 28, 29, 32, 47, 56, 58, 82, 88, and 139.

Declaration of David W. Zitko ¶ 10.  There were 13 such calls.  Declaration of David W. Zitko at ¶ 10.

The calls to 915-861-0528 on which a message was left (the first ANSWERING_MACHINE call on each day) are shown on lines 26, 30, 33, 37, 39, 42, 45, 49, 52, 55, 57, 59, 63, 65, 68, 71, 74, 75, 78, 81, 83, 86, 89, 93, 96, 98, 101, 104, 107, 111, 115, 117, 120, 123, 126, 130, 133, 136, 138, 140, 143, 146, 149, 152, 155, 157, 160, 163, 166, 169, 172, 175, 178, 181, 184, 186, and 189.  Declaration of David W. Zitko ¶ 11.  There were 57 such calls. Declaration of David W. Zitko ¶ 11.

True, King got 70 calls involving a prerecorded message intended for someone else.  But she didn't answer more than the first few.  She soon realized that the calls from the Time Warner Cable 800 number were not intended for her, and she ignored them.

> Q. And if the phone would ring from an incoming call, you would take a look at it and direct it into your voicemail.
>
> So you wouldn't answer the call, would you?
>
> A. Not after I realized it was the same thing over.  I would just listen to them afterwards.
>
> Q. So when the call came in, if I understand this, you recognized the number 800-892-2253, you would see it and you would direct the call immediately into

voicemail?

A. Yes.

Q. And that was after about the first couple of weeks; is that right?

A. Correct.

Deposition of Araceli King at 139 (**Exhibit 2**).

With almost all the calls to King being directed into her voicemail, it

is easy to see that . . .

- *King has no damage or injury*.

King's chief complaint is that she thought the calls from Time

Warner Cable might affect her credit.  But they didn't.

Q. How have you been affected by getting the calls from Time Warner Cable?

A. Well, my main concern was my credit; that they were going to confuse the number on that account with mine, because that was under my name. That was my number one concern that it was going to affect my credit. I was paranoid about that.

      . . . .

Q. And did it have any effect on your credit?

A. No.

Q. In other words, as far as you know, your credit score hasn't gotten better or worse because of this?

- 9 -

A. Correct.

Deposition of Araceli King at 147–48 (**Exhibit 2**).

Nor did King sustain any physical injury, emotional injury, or financial loss.

Q. What other ways did these telephone calls affect you?

A. Other than the fact that it was just frustrating.

Q. Did you get any medical treatment for your frustrations?

A. No.

Q. Any psychiatric treatment?

A. No.

Q. Did you incur any medical expenses?

A. No.

Q. Did you go to any counseling?

A. No.

Q. Did you lose any money because you got these phone calls?

A. No.

. . . .

Q. Did your receiving the phone calls from Time Warner Cable cause you to lose any money out of your pocket?

A. No.

- 10 -

Q. So you have no financial loss because of it?

A. Correct.

Q. And no physical injury?

A. Correct.

Q. And no mental injury?

A. Correct.

Deposition of Araceli King at 154–55 (**Exhibit 2**).

## ARGUMENT

## TIME WARNER CABLE'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

The Telephone Customer Protection Act, makes it "unlawful for any person . . . to make any call . . . using any an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1); *Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 805 (2d Cir. 2014). The TCPA, however, permits calls "made with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A); *Nigro*, 769 F.3d at 806. Thus, for King to prevail on her motion, she must prove three elements: "(1) A call was placed to a cell or wireless phone; (2) by the use of any automatic dialing system and/or leaving an artificial or prerecorded message, and (3) without prior consent of the

recipient."[2] *Harris v. World Fin. Network Nat'l Bank*, 867 F. Supp. 2d 888, 892 (E.D. Mich. 2012) (quoting *Pugliese v. Prof'l Recovery Serv. Inc.*, 2010 WL 2632562, at \*7 (E.D. Mich. June 29, 2010)); *see also Echevvaria v. Diversified Consultants, Inc.* 2014 WL 929275, at \*4 (S.D.N.Y. Feb. 28, 2014).

King cannot prove the final element—lack of consent—because she admits that she gave her "cellular number to [Time Warner Cable] in connection with her [Time Warner Cable] account." Declaration of Araceli King ¶ 3.  She also consented to receive calls from Time Warner Cable when she agreed to the terms of the residential services subscriber agreement, which allows Time Warner Cable to call any number the customer gives it.

King also has difficulties proving the second element—calls made by using an automatic telephone dialing system or using a prerecorded voice.  Time Warner Cable's IVR system does not fit the statutory definition of an automatic telephone dialing system.  And the IVR system only uses a prerecorded voice on the first answered call, which means that King's call count is overinflated.

---

[2] King is mistaken when she says that lack of consent is a defense.  It is not.  It is part of her prima-facie case under the TCPA.  As a general matter of tort law, consent "is not, strictly speaking, a privilege, or even a defense, but goes to negative the existence of any tort in the first instance."  W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 18, at 112 (1984) (footnotes omitted); *cf.* Restatement of the Law of Torts: Intentional Torts to Persons § 101 & cmt. i (Council Draft No. 1, 2013).  Thus, King must prove that the calls to her were made without her consent.

Before demonstrating how and why King's proof comes up short, it is important to emphasize that King has sustained no legally cognizable injury and thus can't bring her action.

- *The court should enter summary judgment in Time Warner Cable's favor because the plaintiff has suffered no injury, which is a Constitutional-standing requirement.*

For this court to have subject-matter jurisdiction, King must have standing. Standing requires that (1) the plaintiff "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180–81 (2000).

The Second Circuit has applied the *Friends of the Earth* factors to dismiss actions alleging a statutory violation in which the plaintiff has no injury. The leading decision is *Kendall v. Employees Retirement Plan of Avon Products*. 561 F.3d 112 (2d Cir. 2009). In *Kendall*, which was brought under ERISA, the plaintiff alleged that the plan administrator had violated the statute in how it operated the plan. Kendall could not, however, show that the administrator's actions had caused her "an identifiable and quantifiable injury." 561 F.3d at

122. Because Kendall's case consisted of no more than a statutory violation without any recognizable harm to her, the court of appeals held that she did not meet Article III's standing requirement. 561 F.3d at 117. The Second Circuit relied on the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and emphasized that a plaintiff must have a concrete and particularized injury to satisfy the Constitutional-standing requirement.

> "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be concrete and particularized as well as actual or imminent, not conjectural or hypothetical." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (internal quotation marks omitted); *see also Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. "[T]o support standing, the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Baur*, 352 F.3d at 632 (internal citation omitted).

*Kendall*, 561 F.3d at 118.

Since its decision in *Kendall*, the court of appeals has continued to apply its three-factor test for standing. *Taveras v. UBS AG*, ___ Fed. App'x ___, ___, 2015 WL 1934576, at *1 (2d Cir. April 30, 2015) (summary order); *Slayman v. SLM Corp.*, 506 Fed. App'x 61, 65 (2d Cir. 2012) (summary order). Recently, the Supreme Court granted certiorari in a case to clarify that a plaintiff, such as King, who suffers no concrete harm may not invoke a federal court's

jurisdiction "based on a bare violation of a federal statute." Petition for Writ of Certiorari at i, *Spokeo v. Robins*, 135 S. Ct. 1892 (2015). The Court's decision in that case likely will apply to actions under the Telephone Consumer Protection Act. *See* Brief for Amici Curia eBay Inc. et al. at 8, *Spokeo*, 135 S. Ct. 1892 (listing analogous statutes).

King does not satisfy the first of the standing requirements because she does not have an injury in fact. She has telephone calls to her cell phone, the overwhelming majority of which ended up on her answering service because she knew that call was not for her and so she ignored it. She has no physical injury, emotional injury, or financial loss. Despite her unfounded worries, her credit rating was not affected. She never missed an emergency call.

King thus has no injury in fact and no injury other than a technical violation of a statute if consent is not found: Time Warner Cable's having called her using a prerecorded message when it attempted to reach another customer. And because she has no injury in fact, she has no standing sufficient to confer subject–matter jurisdiction on the court.

- *Alternatively, the court should enter summary judgment in Time Warner Cable's favor because the plaintiff is a Time Warner Cable customer, she voluntarily provided her phone number to Time Warner Cable, and she gave consent for Time Warner Cable to call her number using any method for any purpose.*

A customer's voluntarily furnishing her cellular number constitutes express consent to receive calls on the number using both an automatic telephone dialing system and a prerecorded voice.  *See*, *e.g.*, *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 467 (E.D.N.Y. 2012) ("the authorities are almost unanimous that voluntarily furnishing a cell phone number to a vendor or other contractual counterparty constitutes express consent"); *Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409, 418 (E.D.N.Y. 2013) ("'Prior express consent' to be contacted on a cell phone via an ATDS in regards to a particular debt has been deemed granted in situations where a plaintiff provided his or her cell phone number to a creditor during the transaction that resulted in that particular debt"); *Mais v. Gulf Coast Collection Bureau*, 768 F.3d 1110, 1124 (11th Cir. 2014) ("Mais, through his wife, gave the hospital just such permission.  On his behalf, Mais's wife gave his cell phone number to a Hospital representative."); *Baisden v. Credit Adjustments, Inc.*, 2015 WL 1046186, at *8 (S.D. Ohio Mar. 10, 2015).

In this case, King did just that: she "provided [her] cellular telephone number to Time Warner Cable in connection with [her] Time Warner Cable account."  Declaration of Araceli King ¶ 3.  Thus, King consented to receive calls from Time Warner Cable on her cell phone using methods that

might otherwise violate the Telephone Consumer Protection Act.

King also consented to receive auto-dialed calls and calls using a prerecorded voice when she signed up for Time Warner Cable's services.  The residential services subscriber agreement then in effect provided that "[b]y signing your Work Order or using our Services, you accept (in other words, make legally binding)" the subscriber agreement.

The agreement itself permits Time Warner Cable to make auto-dialed calls and to use an artificial or recorded voice during its calls.  It says,

> 12. **You are Consenting to Phone and Email Contact**
>
> (a)  We may call any number you provide to us (or that we issue to you) for any purpose, including marketing of our Services. . . .
>
> (c)  We may use automated dialing systems or artificial or recorded voices to call you.

Time Warner Cable Residential Services Subscriber Agreement § 12(c) (**Exhibit A**).

Neither the cases nor the contract support King's assertion that her consent was limited to calls intended for her.  Consent is an objective act (i.e. giving someone a cellular number).  Thus, it cannot be qualified by an unspoken subjective intent, such as King now says she had.  When King gave her cell number to Time Warner Cable she consented to receive calls from it on it.  It

- 17 -

would be wholly unworkable for the consent conferred by furnishing a cellular number to be limited by a customer's unspoken qualification, such as only calls on Tuesdays or only calls for pizza.

True, it is unfortunate that King got calls intended for someone else. But the TCPA does not turn a mistake into money. Once King furnished her number to Time Warner Cable, she consented to receive calls on that number, including calls that might be prohibited by the TCPA and calls intended for someone else.

- *Alternatively, King's motion for summary judgment should be denied relating to calls on which messages were not left because Time Warner Cable's IVR is not an automated dialer as defined by the statute.*

An automatic telephone dialing system is defined in the Act to mean "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Whether a system is an automatic telephone dialing system thus turns on whether it is capable at the time of use of autonomously generating "random sequences of [ten] digit[]" phone numbers or autonomously generating sequential sets of ten-digit phone numbers, e.g., "(111) 111-1111, (111) 111-1112, and so on." *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014); *see also Dominguez v. Yahoo!, Inc.*, 8

F. Supp. 3d 637, 643 (E.D. Pa. 2014); *Hunt 21st Mort. Corp.*, 2013 WL 5230061, at *3–4 (N.D. Ala. Sept. 17, 2013).  If the system lacks the present capacity to generate random or sequential phone numbers and to dial those numbers, it is not an automatic telephone dialing system, and it is irrelevant whether the system could potentially or theoretically be modified to add those functionalities.  Time Warner Cable's IVR system does not meet that definition.

King's argument reads Congress's requirement of a "random or sequential number generator" out of the statute.  The IVR system can temporarily store numbers.  But those numbers are not stored randomly or sequentially.  Instead, they are retrieved from accounts that are specified and contain telephone numbers that customers have given to Time Warner Cable to associate with their accounts.

Nor are the stored numbers called using either a random- or sequential-number generator.  Before a call is made, the IVR system first checks each number against the customer's account before making a call.  That means some numbers are called (those numbers associated with past due accounts) and some numbers are not (those numbers associated with current accounts or with promises to pay).  In other words, calls are not placed in the sequence in which the numbers stored.

King says nothing in her papers about Time Warner Cable's IVR system's using either a random- or a sequential-number generator to store numbers and call them. That's because Time Warner Cable's IVR system does not use a number generator either to store numbers or to call them.

- *Alternatively, King's motion for summary judgment should be denied because there is a genuine dispute as to how many calls were made and how many messages were left.*

Time Warner Cable did not violate the statute each time it called King's cell phone because on many calls Time Warner Cable did not use a prerecorded or artificial voice. Time Warner Cable's IVR system is set up to use a prerecorded voice when a customer answers the call and, at times, to leave a voice message when the call is answered by an answering machine. But for the consent, a call answered by the customer has the potential to violate the Act. So does a message left on an answering machine. But a second or later call on the same day that goes to the answering machine does not violate the Act because the IVR system terminates the call and no message is left.

*Using* a prerecorded voice means using a voice. *See generally* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69–77 (2012). *Using* is the noun form (gerund) of *use*. To *use* something—in this instance, a prerecorded voice—is to "employ [it] for the

accomplishment of a purpose." Black's Law Dictionary 1776 (10th ed. 2014).

If the prerecorded voice does not play to leave a message, it is not being

employed to accomplish a purpose. In fact, it accomplishes nothing when it is

not played. Thus, a prerecorded voice is not used when it is not played and no

message is left.

Indeed, the wording of the prohibition in the Act underscores that to

use an artificial or prerecorded voice requires that the voice itself must be

capable of being heard. *See generally* Antonin Scalia & Bryan A. Garner,

Reading Law: The Interpretation of Legal Texts 140–43 (2012). Recall that the

Act makes it unlawful for a person "to make any call . . . using any automatic

telephone dialing system or an artificial or prerecorded voice." The provision as

written thus prohibits two things: (1) using an automatic telephone dialing system

to make a call and (2) using an artificial or prerecorded voice to make a call.

The first of these makes sense because automatic telephone dialing systems are

used to make (i.e., dial) calls, and the Act prohibits using one to make (or dial) a

call.

But an artificial or prerecorded voice can't be used to make a call, at

least not in the sense that it dials the call. Thus, to use an artificial or

prerecorded voice to make a call must mean something other than to place or dial

- 21 -

the call (or to have the potential to use the voice when a call is placed or dialed). It must mean to use the voice in the sense of playing the artificial or prerecorded voice so that it is heard when the call is made.

This reading of the statute means that the calls to Araceli King in which no voicemail message was left do not violate the Act. These are the second or third calls in a day to an answering machine and are calls with a duration of only a few seconds—just enough time to hang up when the answering machine is detected.

King's argument that when Time Warner Cable's IVR system reaches an answering machine and hangs up it leaves a so-called silent message is as unsupported as it is wrong. In anyone's dictionary, silence is not the result of using a voice. If there is no message, a prerecorded or artificial voice is not used, and the Act's prohibition is not violated.

- *And, finally, King's motion for summary judgment should be denied relating to enhanced damages because Time Warner Cable never intentionally called King while attempting to reach another customer.*

Time Warner Cable is not liable for treble damages because it did not "willfully or knowingly violate" the Act. The Eleventh Circuit recently clarified that willful or knowing conduct requires the violator to know that its conduct violates the statute (e.g., that the violator is using an automatic telephone

system to place a call to a cell number).

> The requirement of "willful[] or knowing[]" conduct requires the violator to know he was performing the conduct that violates the statute. *Cf. Alea London Ltd. v. Am. Home Servs. Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) ("The [Act] does not require any intent for liability except when awarding treble damages.") For example, to violate section 227(b)(1)(A)(i), a defendant must know that he is using an "automatic telephone dialing system" to place a "call," and that the call is directed toward an "emergency" line. *Id.* § 227(b)(1)(A)(i).

*Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015); *cf. Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1927–28 (2015) (knowledge that acts were infringing for patent infringement).

The treble-damages provision is not triggered simply because someone uses a prerecorded voice on a call to a cellular number or makes a call to such a number using an automatic telephone dialing system without consent.

> If we interpreted the statute to require only that the violator knew he was making a "call" or sending a fax, the statute would have almost no room for violations that are *not* "willful[] or knowing[]." *See Harris v. World Fin. Network Nat'l Bank*, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012) ("Such a broad application of 'willful[]' or 'knowing' would significantly diminish the statute's distinction between violations that do not require an intent, and those willful[] and knowing

> violations that [C]ongress intended to punish more
> severely.").

*Lary*, 780 F.3d at 1107.   In this instance, treble damages are not warranted because there is no evidence that Time Warner Cable knew that the number that King had provided to it was a cellular number, that King, who had given the number to Time Warner Cable, didn't want calls, or that it was using an automatic telephone dialing system (which it was not).

Nor did Time Warner Cable know that it was calling the wrong person.   Time Warner Cable keeps records of its customer's calls, and there is simply no record of King's calling to say that Time Warner Cable was calling the wrong person.

> Q. To your knowledge, did Araceli King call to inform Time Warner Cable that she was getting calls for a wrong account?
>
> A. I found no record at all that she never did that.
>
> Q. Okay.
>
> And we talked about this a little but when we were looking at the exhibit with the vendor calls, there are some occasions where it looks like she was transferred to someone, but that's where the knowledge ends for Time Warner Cable?
>
> A. Well, the knowledge is that there's also no notes on the account.

Deposition of David W. Zitko at 91–92 (**Exhibit 7**).

King's having started her action and having mailed her complaint to Time Warner Cable does not make its later calls willful and knowing. Time Warner Cable did not accept service of process on March 26, 2014. It agreed to waive service of process, and March 26, 2014 is the date the *plaintiff* put on the waiver as the date from which the 60-day period to answer would run. *See* Fed. R. Civ. P. 12(a)(1)(A)(ii). There is no proof that Time Warner Cable got the complaint by March 26, and the likelihood that it did is doubtful given that the clerk did not even open the docket until March 25, the day before.

More to the point, the complaint includes neither King's street address nor all digits in her cell number, both which would be necessary to change account records.

> 3.    The plaintiff, Araceli King ("Plaintiff"), is an adult individual residing in El Paso, Texas, and is a "person" as defined by 47 U.S.C. § 153(39).
>
>        . . . .
>
> 5.    Beginning in an around July, 2013, T[ime] W[arner Cable] placed calls to Plaintiff's cellular telephone, number 915-xxx-0528.

Complaint ¶¶ 3, 5. So King's mailing her papers to Time Warner Cable with these data points missing is not evidence of willful and knowing conduct.

Nor is King's lawyer's June 23, 2014 email to Time Warner Cable's lawyer evidence that Time Warner Cable knew it was violating the statute. Information given to an attorney is not imputed to the client when the client's liability requires proof of the client's knowledge or intent. *See* Restatement (Third) of the Law Governing Lawyers § 28 & cmt. b (2000). So what the attorney might have been told is beside the point. Moreover, King neither has nor should have evidence whether the email was forwarded to Time Warner Cable. In any event, Time Warner Cable's calls to King's cellular number stopped soon thereafter.

## CONCLUSION

King consented to receive calls from Time Warner Cable on her cell phone when she gave it her cellular number. Thus she has no valid claim against Time Warner Cable for calls that might otherwise violate the prohibitions in the Telephone Consumer Protection Act.

Similarly, King was not injured when she answered 13 calls from Time Warner Cable and directed another 57 calls into her voicemail. She has no physical injury, emotional injury, or financial loss. And thus she also has no injury in fact for Constitutional standing to bring this action.

This court should grant Time Warner Cable's cross-motion for

summary judgment and dismiss King's action.   Her summary-judgment motion

should be denied.

Dated:  New York, New York
        July 2, 2015

        s/Charles D. Cole, Jr.
        Charles D. Cole, Jr.
        Newman Myers Kreines Gross Harris, P.C.
        Attorneys for Defendant Time Warner Cable Inc.
        40 Wall Street
        New York, New York 10005-1335
        (212) 619-4350
        dcole@nmkgh.com

## CERTIFICATE OF SERVICE

I certify that on July 2, 2015 the memorandum of law of Time Warner Cable Inc. in support of its cross-motion for summary judgment and in opposition to the summery-judgment motion of plaintiff was served on the attorney for the plaintiff,

Jenny DeFrancisco, Esq.
Lemberg & Associates, LLC
Attorneys for Plaintiff Araceli King
1100 Summer Street, 3rd Floor
Stamford, Connecticut  06905,

by filing it using CM/ECF.

s/Charles D. Cole, Jr.
Charles D. Cole, Jr.
Newman Myers Kreines Gross Harris, P.C.
Attorneys for Defendant Time Warner Cable Inc.